FILED
U.S. D.C.

Aug 27, 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith                                                          For rules and forms visit
Clerk of Court                                                          www.ca11.uscourts.gov

August 27, 2020

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  19-10663-CC
Case Style: Christine D'Onofrio v. Costco Wholesale Corporation
District Court Docket No: 0:15-cv-62065-WJZ

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

## UNITED STATES COURT OF APPEALS
### For the Eleventh Circuit

_____

No. 19-10663

_____

District Court Docket No.
0:15-cv-62065-WJZ

CHRISTINE D'ONOFRIO,

Plaintiff - Appellant,

versus

COSTCO WHOLESALE CORPORATION,

Defendant - Appellee.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: July 06, 2020
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10663

_____

D.C. Docket No. 0:15-cv-62065-WJZ

CHRISTINE D'ONOFRIO,

Plaintiff-Appellant,

versus

COSTCO WHOLESALE CORPORATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 6, 2020)

Before WILSON, MARCUS, and BUSH,[*] Circuit Judges.

BUSH, Circuit Judge:

_____

[*] Honorable John K. Bush, United States Circuit Judge for the Sixth Circuit, sitting by
designation.

This case concerns the obligations of an employer to accommodate a deaf employee under the Florida Civil Rights Act of 1992 (FCRA), § 760.01 - § 760.11. The dispute arose after Costco Wholesale Corporation terminated the employment of Christine D'Onofrio, who has been deaf since birth. She sued Costco in Florida state court for violations of the FCRA, and Costco removed the case to federal court. The trial ended with a jury verdict in Costco's favor on one count of wrongful termination, but against the company on D'Onofrio's failure-to-accommodate claim, which is the subject of this appeal. As to this latter claim, the district court granted Costco's motion for judgment as a matter of law and, in the event that this judgment were to be reversed on appeal, conditionally granted Costco's motion for a new trial based on the verdict being against the great weight of the evidence.

For the reasons explained below, we agree with the district court that there was insufficient evidence to support the failure-to-accommodate claim. Therefore, we **AFFIRM** the district court's grant of judgment as a matter of law to Costco pursuant to Federal Rule of Civil Procedure 50(b). In light of this holding, we need not address D'Onofrio's second appeal related to the court's conditional grant of Costco's new-trial motion.

## I.

### A.    D'Onofrio's Employment at Costco: 1989 to 2011

In 1989 D'Onofrio started her employment at Costco's Davie, Florida warehouse. (Doc. 79, p. 9; Doc. 116, p. 190). There, she worked for approximately 14 years, during which about 15 to 20 people at different times served as her manager. (Doc. 117, pp. 10-11, 18). None of these supervisors had any difficulty communicating with her, and she never filed any complaint with Human Resources about any of them. (*Id.*, pp. 11-12).

In 2003, D'Onofrio transferred to another Florida-based Costco warehouse, in Pompano Beach. She acknowledged that, for many years in this job, she had no "issues with managers involving communication," and "was able to communicate with managers and coworkers effectively" and "successfully." (Doc. 117, pp. 22, 24-25). D'Onofrio's performance evaluations prior to 2012 attest to these facts. (Doc. 118, pp. 67-79; Doc. 112-4-7). She testified that as of "June 2011," she "was very happy" with her employment at Costco. (Doc. 117 p. 25). In addition, during this period, there were relatively few behavioral incidents involving D'Onofrio.

In fact, there were only two such incidents reported. The first, in 2007, involved an argument between D'Onofrio and another employee. (Doc. 117, pp. 26-32). For this encounter, D'Onofrio received an "Employment Counseling Notice"— Costco's version of an employee warning. (*Id.*). The second incident, in 2011, involved D'Onofrio's allegation that another Costco employee had hit her with a scrubber. When D'Onofrio complained to Costco, she was told to steer clear of the

3

employee in question.  Upon investigation of the matter, however, Costco ultimately

concluded that D'Onofrio had not been struck; therefore, the company took no action

against the other employee.  (Doc. 117, p. 33; Doc. 120, pp. 168-71).

**B.    D'Onofrio's Employment Concerns Related to Her Deafness: 2012**

During the summer of 2012, the work situation changed for D'Onofrio.  She

began to experience "difficulties with Alan Pack,"  (Appellant Br. at 8), the new

general manager.  (Doc. 116, p. 34).    According to D'Onofrio, Pack "mumbled,

ma[de] lip-reading impossible, refused to communicate with her in writing, ignored

her when she tried to talk to him, ridiculed her for talking with her hands, 'smirked'

over her attempts to communicate, and was sarcastic." (*Id.* (citing Doc. 117, pp. 34-

38)).  This conduct led D'Onofrio to "invoke[] the company's 'open door policy'

that allowed employees to lodge complaints with their managers' higher-ups." (*Id*.

(quoting Doc. 119, p. 200)); (*see* Doc. 119, p. 200; Doc. 118, p. 134; Doc. 120, p.

162); (see also Jnt. Exh. 1, p. 11) (Costco Employee Agreement, § 2.1.)).  D'Onofrio

"thought 'it [was] vital [] to have access to communication about my workplace,'

and believ[ed] that" accessing the open-door policy was necessary because "she had

'exhausted the chain of command' at the store with no resolution." (*Id.*).

Accordingly, on November 20, 2012, D'Onofrio wrote a letter to Costco's

Chief Executive Officer (CEO), Craig Jelinek, informing him of her communication

issues with Pack.  (Doc. 117, p. 38; Doc. 99-43).  Pack's treatment of her was

"causing her great mental, physical, and emotional stress."  (Appellant Br. at 8); ((*See* Jnt. Exh. 5) (Nov. 20, 2012 letter) (*see also* Doc. 117, p. 41).[1]  D'Onofrio explained to Jelinek that "[a]s a born deaf person, I have always been able to communicate with my managers.  I am a lip reader and can speak well." (*Id*.).  She appeared to be suggesting that the types of problems she was experiencing with Pack were new.[2]

The day after Jelinek received D'Onofrio's letter, he and Steve Powers, Costco's Vice President and Regional Operations Manager, reached out to schedule a meeting so D'Onofrio could voice her concerns related to Pack.  (Doc. 117, p. 147).  Shortly thereafter, in December 2012, Powers and Angela LiCastro, a member of Costco's Human Resources Team, traveled to Fort Lauderdale, Florida to meet personally with D'Onofrio and investigate her complaint.  (*Id*. pp. 147-48).  During the meeting, D'Onofrio described her communications issues with Pack.  To help resolve these concerns, she made two requests of Powers and LiCastro: (1) that Pack be transferred to a different Costco warehouse, and (2) that all Costco managers be trained on deaf culture.  (*Id.* pp. 40, 42-43, 149).  D'Onofrio did not ask Powers or

---

[1] When asked at trial to explain the letter, D'Onofrio responded: "how am I supposed to solve a problem with someone who refuses to communicate with me? And he was the only one who refused to talk to me was Alan Pack."  (Doc. 117, pp. 39-40).

[2] D'Onofrio testified that she had "always been able to communicate with all of [her] managers" before Pack.  (Doc. 117, p. 38).

LiCastro for any other specific accommodation that might help her improve her communications with Pack. (Doc. 117, pp. 40, 149-150).

## C.   Costco's Response to D'Onofrio's Concerns

### 1.   Installation of Video Remote Interpreting Equipment

Immediately after the meeting, Costco implemented several new measures, including: (1) installing Video Remote Interpreting (VRI) equipment in two locations at the Pompano Beach warehouse; and (2) subscribing to a VRI service. (*Id.* pp. 151-53). A VRI service uses remote online sign language interpreters, who can be contacted by way of video phone to facilitate communication between a deaf individual and a hearing individual, both of whom are on the other end of the call from the interpreter. (*Id.*). Costco felt that VRI would assist D'Onofrio in her communication with Pack and other managers, given the equipment could interpose a qualified interpreter between the two parties. To make the VRI more accessible, Costco installed the equipment in two locations within the Pompano Beach warehouse: the managers' office, where informal coaching meetings, counseling notices, and performance reviews typically occurred, (Doc. 118, pp. 8-9), and the pharmacy consultation room, which was located close to D'Onofrio's work space. (*Id.* pp. 9-10). Lastly, Costco ensured that D'Onofrio received VRI training. (Doc. 117, p. 53).

Witnesses introduced by Costco at trial, including Dr. Shana Williams, Director of the Center for Hearing and Communication,[3] spoke of the effectiveness of VRI as a medium to facilitate communication between D'Onofrio and her managers during group sessions. Williams testified that in most situations, VRI is just as effective as an on-site interpreter for communicating with a deaf individual. (Doc. 117., pp. 82-83, 91, 109-11). Williams also testified that while on-site interpreters would be the most preferable medium of interpretation in large-group meetings, such interpreters are by no means mandatory; VRI can be an effective alternative in such settings, even if it functions less efficiently than an on-site interpreters. (*Id.,* pp. 109-11).

D'Onofrio initially considered the installation of the VRI equipment to be positive and "good." (Doc. 117, pp. 53, 60). However, as D'Onofrio herself reports, immediately after Costco began using VRI, she began thinking, "I don't have a communication problem, what do we need this for[?]" (*Id.* p. 68 (emphasis added)). D'Onofrio testified that she had never asked for the VRI equipment, nor did she need the equipment because she "could communicate." (*Id.*, p. 75; Doc. 118, pp. 13, 46).[4]

## 2.    Deaf-Culture Training: March 2013

---

[3] Williams also conducted the March 1, 2013 deaf-culture training that was requested by D'Onofrio.

[4] On the other hand, however, non-expert witnesses produced by Costco, including Williams, testified that the VRI served as an effective tool to facilitate communication between D'Onofrio and her managers during group sessions.

Honoring D'Onofrio's request for deaf-culture training, Costco arranged for instruction to be provided by the Center for Hearing and Communication in Fort Lauderdale, Florida on March 1, 2013.  The central objective of the training was to facilitate an interactive and open discussion on deaf culture and good communication practices with deaf individuals.  (Doc. 117, pp. 152-53).  The managers in D'Onofrio's immediate chain of command attended the session.  (*Id*., p. 155; Doc. 121, p. 83).

As part of the training, Williams made a number of suggestions to assist D'Onofrio in her communication during Costco's large-group meetings (i.e., "inventory meetings" and "warehouse meetings") going forward.  First, as to large-group meetings, Williams suggested that Costco should consider providing D'Onofrio with an on-site interpreter, given that the VRI technology is considered less effective in this setting.  (Doc. 121, pp. 109, 147).  Although Williams made clear there was no definitive number of people as to constitute a "group," in her opinion, any gathering of three or more people could be considered a benchmark. *Id*.  Second, Williams suggested that Costco designate a small group of no more than three managers, with whom D'Onofrio was already comfortable, to act as the primary conduits for her day-to-day work interactions.  These interactions would include providing directions to D'Onofrio, as well as serving as go-to contacts for questions or concerns she might have.  (Doc. 121, p. 90).  However, D'Onofrio

testified that when Williams proposed the three-manager team, she immediately felt the measure was unnecessary.  (Doc. 117, p. 60) ("So first [Williams] asked me who I wanted to communicate with.  And I said I'm fine with everyone.  Again my job is to communicate with everybody.  But, [Williams] went ahead and picked three people out of the audience.").

### a. Proposal One: On-Site Interpreters

After the March 1, 2013 meeting, Costco arranged for on-site interpreters at large-group meetings but not for counseling or coaching sessions D'Onofrio attended.  (Doc. 119, p. 95; Doc. 120, p. 217; Doc 122, p. 59).  She argues that many of those sessions included at least three individuals, which, to her, meant that on-site interpreters should have been provided on those occasions as well (as opposed to simply the VRI technology being available).  (Doc. 117, p. 76).  Costco counters that in the few counseling or coaching sessions involving three or more people present, VRI was still an appropriate measure, given that these sessions were limited to discussions between just two people (including D'Onofrio), with all others in the room observing silently.  (Doc. 119, pp. 111-12; Doc. 122, pp. 36, 54-56, 158-59).

### b. Proposal Two: Limiting D'Onofrio's Communications to a Three-Manager Team

Implementing Williams's second proposal, Costco also agreed to limit certain communications with D'Onofrio to a specific three-manager team, composed of Assistant General Manager Ainsley Brown, Hardlines Manager Carol Sivon, and Pharmacy Manager Jeff Weisler.  (Doc. 117, pp. 60-64; Doc. 118, p. 182; Doc. 120, pp. 43-50).  This accommodation, however, came with certain qualifications, one being that the three-manager team arrangement should not be considered an excuse for D'Onofrio to avoid certain Costco managers, including Pack.  (Doc 121, pp. 90, 115).  The aim of the arrangement was to facilitate D'Onofrio's expanded communication with other managers, as opposed to limit it.  (*Id.* at 115).  Sivon underscored this objective, testifying that Powers had explicitly requested that D'Onofrio not refuse to take instructions or directions from other managers in the future.  (Doc. 122, pp. 157-58).

Yet, even with these explicit warnings, D'Onofrio refused after the training to interact with Pack.  (Doc. 120, pp. 48, 50, 55, 57).  This resistance led LiCastro to contact D'Onofrio by letter on May 13, 2013, informing her that the three-person arrangement was no longer feasible.  This meant that going forward, D'Onofrio would be expected to communicate with, and take directions from, Pack.  (*Id.*, p. 30; Doc. 99-3).  Yet, it appeared the functional effect of LiCastro's letter was null, given the three-manager arrangement continued beyond May 13, 2013.  (Doc. 117, p 87).

**D.    Alan Holliday's Transfer to the Pompano Beach Warehouse: April 2013**

In April 2013, Alan Holliday transferred to the Pompano Beach warehouse, assuming the role of merchandise manager. (Doc. 122, p. 20). Holliday was a direct supervisor of D'Onofrio, meaning the two interacted every day that they worked together. (*Id.* pp. 20-21). Holliday had not been able to attend the March 1, 2013 training because it predated his transfer. Nonetheless, D'Onofrio admitted that she had no problems communicating with Holliday, and actually got along well with him for the first several months that the two worked together. (Doc. 118, p. 13; Doc. 122, p. 20). Holliday came to the Pompano Beach warehouse with some knowledge of sign language and a degree of familiarity with deaf culture, given he grew up with a close relative who was deaf, and had socialized with the relative's immediate deaf community. (Doc. 118, p. 13; Doc. 122, pp. 21-22, 47). Holliday also was familiar with VRI, having used VRI devices previously. (Doc. 122, p. 22). Upon his arrival to the warehouse, Holliday received a tutorial from Pack in the VRI technology available in the vicinity. (*Id.*).

### 1.    D'Onofrio's Employment under Holliday: August 28 to October 18, 2013

There were, as noted, only two reported behavioral incidents involving D'Onofrio between 2003 and 2012, but the situation changed while she was under Holliday's direction. Although they had gotten along well at the outset of his tenure

at the Pompano Beach warehouse, D'Onofrio testified that, in the fall of 2013, Holliday began repeatedly to accuse her of being loud, angry, and insubordinate. She also received a "flurry" of Employment Counseling Notices (ECNs) from Holliday, relating to her behavior on the floor of Costco and in ECN meetings. Appellant Br. at 18.  This conduct included D'Onofrio's reportedly talking loudly, yelling, being aggressive, demanding eye contact and making dramatic and emphatic gestures.   At ECN meetings in particular, D'Onofrio was twice suspended for insubordination and unbecoming conduct, first on September 6, 2013 (Doc. 117, pp. 82-83; Jnt. Exh. 20), and again on October 18, 2013.  (Doc. 117, p. 93; Jnt. Exh. 27).

Between August 28 and October 18, 2013, D'Onofrio was coached and counseled on a number of occasions for inappropriate and insubordinate behavior. (Doc. 99, pp. 30, 32-34).  Although VRI was made available to D'Onofrio for all of these coaching and counseling sessions, (Doc. 119, pp. 21, 27, 29, 103, 112, 116, 120-2), she frequently refused to use the technology. (Doc. 122, pp. 25, 29, 35, 40, 132, 163, 165-66); (Doc. 118, pp. 13, 42; Doc. 122, pp. 25, 35, 40, 163, 166).  In fact, even when asked explicitly by her managers to use VRI, D'Onofrio responded, "why is everybody making such an issue about the VRI.  I don't [need] it.  There is no communication issue.  Just talk to me." (Doc. 117, p. 75).  During several counseling or coaching sessions, D'Onofrio even turned off, or attempted to turn off, the VRI phone.  (*Id*. p. 81; Doc. 118, p. 42; Doc. 122, pp. 25, 35, 166).

### 2.   D'Onofrio's Suspension and Termination: October 2013

On October 18, 2013, D'Onofrio was suspended for repeated policy violations,[5] pending a review of possible termination.  (Doc. 99, p. 39).  Five days later, Pack met with D'Onofrio, informing her that her employment was being terminated for excessive policy violations.  (Doc. 99, p. 9; Doc. 117, p. 97).  At the October 23, 2013 meeting, D'Onofrio requested an in-person interpreter, which Costco provided.  (Doc. 117, p. 98).

### E.   Procedural History

Approximately two years following her termination from Costco, D'Onofrio filed a lawsuit against Costco in Florida state court.  She advanced two causes of actions, arguing she was discriminated and retaliated against, in violation of Florida Civil Rights Act of 1992, Fla. Stat § 760.01 – § 760.11.[6]  (Doc. 1, p. 1).  Costco removed the case to the U.S. District Court for the Southern District of Florida on the basis of diversity jurisdiction.

The case was tried before a jury from May 29 to June 11, 2018.  At the close of D'Onofrio's case, Costco moved for judgment as a matter of law (JMOL) pursuant to Federal Rule of Civil Procedure 50(a).  The district court denied Costco's motion and sent the case to the jury.  The jury found in Costco's favor on

---

[5] These policy violations related to specific job-related responsibilities held by D'Onofrio, and they did not relate specifically to her refusal to use the VRI technology.

[6] The discrimination action under the FCRA is the only claim relevant to this appeal.

D'Onofrio's claim that she was illegally fired because of her disability and in retaliation for internal complaints she raised about discriminatory treatment she allegedly endured.  (Doc. 103; Doc. 124, pp. 118-21).  However, the jury found in favor of D'Onofrio on her failure to accommodate claim under the FCRA.  Based on Costco's liability, the jury awarded D'Onofrio $750,000 for emotional pain and mental anguish, and $25,000 in punitive damages.

Costco renewed its JMOL motion, pursuant to Federal Rule of Civil Procedure 50(b),  and alternatively moved for a new trial or remittitur.  (Doc. 126; Doc. 127).   The district court granted Costco's renewed JMOL motion and conditionally granted its new trial motion in the event that the JMOL were reversed on appeal.  (Doc. 140).  The district court concluded that no reasonable jury could find that Costco did not provide a reasonable accommodation to D'Onofrio, as Costco provided VRI devices in two locations within the Pompano Beach warehouse, the March 1, 2013 deaf-culture training for warehouse managers in D'Onofrio's immediate chain of command, and on-site interpreters in certain situations, including group meetings.  (Doc. 140, p. 17).  The court also conditionally granted Costco's motion for a new trial, reasoning that the great weight of the evidence was against the jury's verdict.  (Doc. 140, pp. 26-27).

## II.

### A.      Standard of Review

This Court reviews *de novo* the district court's grant of Costco's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000) (per curiam).   A court should enter a JMOL only when there is "no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party." *Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1320 (11th Cir. 2016) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)).

## B.      Florida Civil Rights Act of 1992

Given the parallel structure of the statutes, this Court analyzes state-law disability discrimination claims under the FCRA using the same framework as it does for claims made under the federal Americans with Disabilities Act (ADA). *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1200 n. 2 (11th Cir. 2014);  *see Holly v. Clairson Indus., LLC,* 492 F.3d 1247, 1255 (11th Cir. 2007).  To prevail on a failure to accommodate claim under the FCRA, D'Onofrio must demonstrate by a preponderance of the evidence that (1) she was a qualified individual with a disability; (2) she made a specific request for a reasonable accommodation; and (3) her employer, Costco, failed to provide a reasonable accommodation, or engage in the requisite interactive process in order to identify a reasonable accommodation. *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (per curiam).

Here, both parties concede that D'Onofrio is a qualified individual with a disability, Costco knew of her disability, and one or more reasonable accommodations existed that would have allowed D'Onofrio to perform the essential functions of her job. (Doc. 101, pp. 10-11). Consequently, we consider only whether Costco failed to provide a reasonable accommodation to D'Onofrio, or engage in the requisite interactive process in order to identify a reasonable accommodation for her.

## C.      Failure to Accommodate

### 1.      Legal Standard and Findings Below

Under the ADA, an employer will not be liable for failure to accommodate if the employee is responsible for the breakdown of the interactive process. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Furthermore, "the [employer's] duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made" by an employee. *Gaston*, 167 F.3d at 1363. Even if an employee is legally disabled, she must specifically request an accommodation to trigger the employer's accommodation obligations. *See id.*

Of course, there are limits to the accommodations an employer must provide. The key is "reasonability," meaning an employer is not required to accommodate an employee in *any* manner that the employee desires—or even provide that

employee's preferred accommodation.  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-86 (11th Cir. 1997)  ("[A]n employee is entitled only to a reasonable accommodation and not to a preferred accommodation. . . . Stated plainly, under the ADA a qualified individual with a disability is 'not entitled to the accommodation of her choice, but only to a reasonable accommodation.'" (internal citations omitted)).

Additional nuances to the reasonable accommodation framework are important to highlight as well.  First, if an employee does not require an accommodation to perform her essential job functions, then the employer is under no obligation to make an accommodation, even if the employee requests an accommodation that is reasonable and could be easily provided.  *See Hilburn v. Murata Elecs. N. Am., Inc*. 181 F.3d 1220, 1229 (11th Cir. 1999); *see also Albright v. Columbia Cty. Bd. of Educ.*, 135 F. App'x 344, 346 (11th Cir. 2005) (per curiam) ("[T]he record clearly shows that [plaintiff] did not require an accommodation to perform her job. It is undisputed that [plaintiff] performed her bus driving duties without an accommodation[.]").  Second, even if an employer has voluntarily provided accommodations to the employee historically, that employer is not obligated to continue providing them and can discontinue such when they exceed what is legally required under the ADA.  *See Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997) ("It is equally apparent, however, that the [City's]

17

previous accommodation may have exceeded that which the law requires. . . . [W]e cannot say that [its] decision to cease making those accommodations that pertained to the essential functions of Holbrook's job was violative of the ADA.").

When it granted Costco's renewed Motion for JMOL, the district court made two findings favorable to the FCRA claim: (1) D'Onofrio had presented sufficient evidence that she had made a specific request for an accommodation in order to mitigate the obstacles she was experiencing communicating with her General Manager, Alan Pack; and (2) D'Onofrio had offered sufficient evidence showing her deafness caused her communication problems with Pack, and that communication, both in general with other employees, and specifically with her General Manager, was an function of her Costco job.  However, the district court also concluded that (3) D'Onofrio still did not introduce sufficient evidence to support a jury finding that Costco had failed to provide reasonable accommodations to help ease her communication difficulties.

On appeal, D'Onofrio argues for reversal of the JMOL because the evidence was legally sufficient to support the jury's verdict that Costco failed to provide a reasonable accommodation to her disability of deafness.  In response, Costco does not contest the district court's first two findings in favor of D'Onofrio.  It argues only that we should affirm the district court's third finding, which led to the JMOL. For the reasons explained below, we find Costco's argument persuasive.

## 2.      Evidence Regarding Reasonable Accommodation

The evidence of Costco's reasonable accommodation included its installation of the VRI equipment, organization of the deaf-culture training, and temporary institution of the three-manager communication circle.   In response, D'Onofrio introduced three pieces of undisputed evidence, which she believes "are inconsistent" with the district court's conclusion of reasonable accommodation:

- "Costco's failure to train D'Onofrio's [new] manager, Alan Holliday, about 'deaf culture' and the accommodations recommended by the Center for Hearing and Communication," even though Holliday's arrival at the Pompano Beach warehouse post-dated the March 1, 2013 training;

- "Costco's discontinuation of the three-manager communication team after only ten weeks, coupled with the demand that [D'Onofrio] then communicate with Alan Pack, whom she perceived as hostile"; and

- "Costco's failure to provide on-site sign language interpreters at *every* [Employment Counseling Notice] ECN meeting, where three or more people were always present, as recommended by the Center for Hearing and Communication, instead bringing an on-site interpreter only for the termination meeting."

(*Id.* at 25).

According to D'Onofrio the "district court focused too heavily" on Costco's supplying of the VRI within its warehouse at the expense of the aforementioned evidence.   This disproportionate focus, she explains, resulted in the court "improperly credit[ing] *Costco's* view of the evidence, i.e., that D'Onofrio obstructed [the VRI's] use," as proof that D'Onofrio actually obstructed the provided

accommodation.  Most problematically, as D'Onofrio explains, the district court's conclusion here was based on the "mistaken[] assumption that the VRI was a reasonable accommodation," (*id.* at 26), which in light of her above evidence, equated to a false premise.  (*Id.*).  Therefore, she believes "[a] reasonable jury, making credibility determinations, could (and did) find" that the VRI was not a reasonable accommodation.  (*Id.*).  However, as discussed below, none of the proof that D'Onofrio cites is sufficient to support a jury finding of Costco's failure to accommodate.

### a.  Costco's Initial Response to D'Onofrio's Letter

The undisputed evidence shows that Costco took immediate redressive action when D'Onofrio raised her concerns about Pack in her letter to Costco's CEO.  (Doc. 117, p. 38; Doc. 99-43).  Costco responded by arranging in December 2012 for Powers and LiCastro to fly in from Georgia and Washington state, respectively, to meet with D'Onofrio, along with a sign-language interpreter, to better understand her complaint and find ways to address it.  (Doc. 117, pp. 147-48).

At the meeting, D'Onofrio had ample opportunity to reiterate the concerns in her letter: namely, although she had had good communications with her general managers in the past, she was then experiencing difficulties with Pack because he mumbled and refused to write out his communications.  She also stated that Pack behaved impatiently and rude towards her.  (Doc. 120, p. 37).  To address these

problems, D'Onofrio proposed two solutions to Powers and LiCastro: (1) that Pack be moved to another warehouse, (Doc. 117, p. 40); and (2) that Costco provide training to her managers on deaf culture.  (*Id.*, p. 42)  ("I felt like the managers needed some education, and I wanted to be included in that.")  On the latter point, she requested that Costco ensure "that Alan Pack was a part of that [training] class." (*Id.*, p. 44).

Costco responded appropriately to D'Onofrio's two requests.  Specifically, in connection with D'Onofrio's first request, Powers informed D'Onofrio that he would not transfer Pack.  (Doc. 117, p. 150).  This was a legally permissible response, as both this Court and the Equal Employment Opportunity Commission (EEOC) have indicated that "[a] transfer [of an employee] from an incompatible supervisor is not a 'reasonable accommodation.'"  *Santandreu v. Miami-Dade County*, No. 10-24616-CIV-ALTONAGA, 2011 WL 13136161, at *11 (S.D. Fla. Aug. 1, 2011) (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998)), *aff'd*, 513 F. App'x 902 (11th Cir. 2013); U.S. Equal Emp't Opportunity Comm'n, Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA ¶ 33 (2002), https://www.eeoc.gov/policy/docs/accommodation.html#workplace ("An employer does not have to provide an employee with a new supervisor as a reasonable accommodation.").  Still, however, Powers promised D'Onofrio that he would seek

to improve her communication with Pack.  (Doc. 117, pp. 149-50).  He followed up on this promise less than a month after the meeting, when he advised D'Onofrio that Costco would be installing VRI equipment in the Pompano Beach Warehouse not only to help facilitate her communications with Pack, but also to help her communicate with other managers.  (*Id*,, pp. 151-52).  The technology was installed by the end of January 2013.  (*Id*,, pp. 52-53, 153).

Addressing D'Onofrio's second explicit request within the same timeframe, Costco also advised her that it would organize the type of deaf-culture training she requested.  (*Id*.).  This session, hosted in conjunction with the Center for Hearing and Communication, occurred on March 1, 2013.  Everyone in D'Onofrio's chain of command, including Pack, attended the training.  (*Id*. p. 155).  We address the evidence related to this training in the section that follows.

### b.  Costco's Planning and Implementation of Deaf-Culture Training

In preparation for the deaf-culture training, Costco brought in Williams for a site visit with D'Onofrio.  (Doc. 121 at 80–81).  Williams and a colleague were joined by D'Onofrio and three of her managers: Ainsley Brown, Carol Sivon, and Jeff Weisler.  (*Id*. at 81).  The visit allowed Williams to "evaluate the environment" at the Pompano Beach warehouse.  (*Id*.).  That way, Williams could do more than offer a stock, generic training session; she could "train and tailor whatever

recommendations [she was] going to make to the environment that [was] being presented to" her.  (*Id.*).  Williams testified that the visit was "very useful."  (*Id.*).

As for the training session itself, Williams also testified that she "felt it went very well" and that "everybody was very amenable to the information they received." (*Id.* at 85).  D'Onofrio "was very happy with the session." (Doc. 117, pp. 59–60).  Likewise, Pack thought the training was "very interesting" and "informative." (Doc 118, p. 168). Williams noted that, like the installation of the VRI equipment, the training program represented a significant, meaningful investment from Costco.  Steve Powers even flew in for the training session,  (Doc. 121, p. 83), which was significant, as Williams testified:

> I train quite a bit, still do, and I haven't ever seen a regional vice president fly in for a training. I have never seen that. So I was very pleased and encouraged that upper management was really involved in this process.

(*Id.* at 94–95).  All in all, Williams thought the Costco team "did a really good job" with the training, was "very open and receptive," and went above and beyond what she typically sees from employers. (*Id.* at 95).

D'Onofrio introduced no evidence to call into question the appropriateness of the deaf-culture training for the employees who attended.

### c.  Alan Pack's Follow-Up to the Deaf-Culture Training

The training session was tailored to the specific concerns about Alan Pack expressed by D'Onofrio during her December 2012 meeting with Powers and

LiCastro.  This was evident by the fact that part of the training session involved a "constructive," smaller group meeting between Powers, Pack, Williams, and D'Onofrio. (*Id*. at 86).  At that meeting, Pack and D'Onofrio "committed to coming back and meeting with [Williams] in a mediation session." (*Id*.).  Pack also "offered to meet with [D'Onofrio] on site in their work environment every month and work through any concerns that she might have." (*Id.*).

After the training session, Pack was "very proactive." (*Id*. at 87).  However, when he tried to schedule appointments with D'Onofrio, she would not agree to meet with him. (*Id*.).  So, on his own, Pack returned to the Center for one-on-one meetings with Williams.   (*Id*.).   Those two meetings, Williams testified, were very educational.  (*Id*.).  Pack came in "to see how he could respond [to D'Onofrio] better and what he could learn." (*Id*.).  Williams recalled D'Onofrio's complaint that Pack mumbled, so she worked with him on "clarity without exaggerated speech and tone." (*Id*. at 88).  Williams also testified that, at these one-on-one meetings, Pack

> was not guarded. He wasn't resistant. He felt very sincere to me. He asked good questions. He seemed to take the information from our first session, bring it in practice, and then come back to me and ask me, well this seemed to work really well, this didn't, what do you think, what can I do better. So he seemed pretty motivated and genuine.

(*Id*. at 95).  D'Onofrio offered no evidence to contradict the proof regarding Pack's participation in deaf-culture training and his efforts to learn from that training.

### d.  Costco's VRI Technology

D'Onofrio testified that she did not request VRI, insisting that she simply wanted Pack to communicate with her by writing:

> I just wanted him to write to me.  That's all.  We can write back and forth when we need to communicate.  That's all I wanted.

(Doc. 118, p. 13).  On appeal, D'Onofrio couples her preference for "in-writing" communication with Pack, with her argument that the VRI failed to represent a "reasonable accommodation."  However, the problem with D'Onofrio's argument is two-fold.

First, although communication by writing back-and-forth with Pack may have been D'Onofrio's preferred mode of communication, an employer is not obligated to accommodate an employee in any manner she desires; rather, the employer need only provide a *reasonable* accommodation.  *Stewart*, 117 F.3d at 1285-86.

Second, D'Onofrio presented no testimony as to the lack of "reasonability" of the VRI technology; rather, she cites only three isolated statements made by Pack, Powers, and Williams while testifying as evidence that Costco's installation of VRI equipment was not a reasonable accommodation.  Collectively, according to D'Onofrio, these statements convey the testifiers' beliefs that "the VRI alone was not the solution to [D'Onofrio's] communication problems," "the VRI was just a tool," and "that the VRI alone was not enough to fully accommodate D'Onofrio's special needs."  (Appellant Br. at 15-17).  The portions of these statements that D'Onofrio cites are as follows:

- **Pack's Testimony**

Q: And the reason [Costco] did several things to help her in her accommodation was because the VRI machine alone was not enough without training for the deaf culture, correct?  You couldn't do one without the other; you needed both?

A. [PACK]: Yes.

Q: The [three-manager communication] team was also designed to accommodate her hearing impairment?

A. Yes.

(Doc. 118, p. 182).

- **Powers's Testimony**

Q: You were not expecting at that point in time when you set up that meeting at the center for the deaf culture that the VRI machine was the sole exclusive answer to the communication problems that Christine was experiencing at Costco, correct?

A. [POWERS]: No, it was just an assistance, a tool.

Q. Just an assistance?

A. Yes, sir.

(Doc. 120, p. 196).

- **Williams's Testimony**

Q. Did you believe that the installation of the VRI phone by itself would solve the communication issues that were existing between Christine and Mr. Pack?

A. [WILLIAMS]: I made a recommendation that they both come in to work on some of their communication challenges, so I don't think that was the only intervention that we suggested.

Q. But the installation of the VRI phone by itself would not have solved all the communication problems, correct?

A. No.

(Doc. 121, p. 128).

These statements are insufficient to support a jury finding that Costco failed to provide a reasonable accommodation.  As that testimony itself suggests, Costco did not rely on the VRI as its sole accommodation to D'Onofrio's request.  Instead, the VRI was merely one solution amongst three it provided to D'Onofrio after she voiced her concerns at the December 2012 meeting.  Aside from the installment of VRI equipment, Costco's accommodations for D'Onofrio included the organization of the deaf-culture training already mentioned, and the arrangement for the three-person management communication team, discussed below.

Furthermore, Williams made other statements to demonstrate that the VRI represented a reasonable accommodation.  For one thing, Williams explained in her testimony that the way in which Costco had set up the VRI phones was "very effective."  (Doc. 121, p. 82).  The phones provided D'Onofrio with "an on-demand communicating tool to facilitate communication whenever [she] needed it," (*id.* at 82-83), and Costco deliberately located them in convenient locations around the warehouse, including placing one in the managers' office, a location where informal coaching, counseling notices, and performance evaluations took place, (Doc. 118 at 9), and in the pharmacy consultation room.  (*Id.* at 9-10).  Despite D'Onofrio's

27

claims to the contrary, these locations were hardly out-of-the way spots.  Quite to the contrary, the pharmacy consultation room, for example, was "very close" to where D'Onofrio worked, and gave her a "private space" where her manager could give instructions and where D'Onofrio could "make personal calls."  (*Id*. at 11–12). Not only that, Costco even "offered to move [the phones] if they weren't in a place that Ms. D'Onofrio felt comfortable using" them.  (Doc. 121, p. 82).  Williams also testified that the installation of the VRI equipment amounted to an "unusual" commitment on Costco's part.  (*Id*. at 84).  In her experience, Williams had encountered "some challenges getting organizations to put in [the] technology," particularly because "the technology isn't free for hearing people."  (*Id*.).  Costco, however, was willing to bear the expense of installing two "video phones in two different offices," (*Id*. at 94)—a commitment that Williams testified was "wonderful to see" and "unusual."  (*Id*.).

We recognize that Williams did not provide testimony as an expert witness. However, given her qualifications, which include being the Director of the Center for Hearing and Communication, and the fact that she served as the instructor for the deaf-culture training, Williams's opinion warrants consideration regarding the reasonableness of the VRI as an accommodation.  And, at trial, Williams did attest to the technology's effectiveness in facilitating communication between a deaf person and non-deaf person, which, as she also explained, was a function of the

technology's reliance on an on-screen hearing and a speaking sign-language interpreter.

Additionally, LiCastro sent an email to D'Onofrio describing the benefits of the VRI equipment two weeks before the phones' installation.  LiCastro explained that the technology was easy to use and offered on-demand, video access to a certified interpreter 24/7.  (DX 8).  Critically as well, the VRI equipment offered specific advantages over an in-person interpreter: there was no need for the typical two weeks' advance notice to arrange the visit of the interpreter, and D'Onofrio could access the VRI devices "as needed without the hassle of scheduling or re-scheduling as needs change."  (*Id*.).  Costco had already installed these devices in 26 of its stores and had seen them deliver "tremendous benefits."  (*Id*.).

Furthermore, as the district court rightly noted, the trial record is "utterly devoid of any testimony that the VRI did not function adequately."  (Doc. 140 at 26).  Instead, the evidence shows it was D'Onofrio who regularly refused to use the phones or stood in the way of their proper functioning.  As Holliday testified:

Q: What happened when you went into the pharmacy consultation room?

A: I attempted to start the VRI, and Ms. D'Onofrio ended the call before it connected. And I go, no, we need to use this. And she goes, I don't want to use it. You can talk to me. I understand you just fine. And I go, no, I want to be clear with what I have to tell you.

(Doc. 122 p. 25).  Holliday described another meeting like this:

Q: Okay. So that was the meeting when this counseling notice was being presented to Ms. D'Onofrio?

A: Correct.

Q: Okay. And was a VRI machine used during that meeting?

A: It was not. She refused to use it. So [Ainsley] Brown agreed to write what he had to say to her.

(*Id.* at 35).

### e. Absence of Evidence that Costco Refused to Provide any of D'Onofrio's Requested Alternative Accommodations

D'Onofrio argues that Costco's accommodations were not reasonable because she requested alternative accommodations that were not granted.   However, D'Onofrio cites no evidence to show that she requested alternative accommodations that went unfulfilled.  In particular, her argument on appeal about not being allowed an on-site interpreter is without merit.  She references only three alleged occasions following the December 9, 2012 meeting where she claims she asked for an on-site interpreter.  (Doc. 117, pp. 76, 98).  In each alleged instance, either the evidence was not sufficiently clear that D'Onofrio, in fact, had made the request or the uncontradicted proof was that Costco had granted her request.

For example, D'Onofrio claims that she asked for on-site interpreters in a July 8, 2013 email sent to LiCastro.  (*Id.*, p. 76; Doc. 99-25, pp. 2-3).  But D'Onofrio does not point to any specific statements where she made this request.  In fact, the email shows that D'Onofrio made no such request; rather, her reference to

interpreters involved her simply complaining that she should be compensated for not having been given the benefit of interpreters in the past.  (Doc. 99-25, pp. 2-3).  The relevant email text read as follows:

> You know what I never had an interpreter for 12 years. Costco violated the policy. I had to complain all the time. I was too damn nice for not making Costco responsible to pay me for my disability as a reasonable accommodation. Costco is responsible to provide as an assistance with ADA and also is reponsible [sic] to pay me for all those years.

(*Id.* at 2).

D'Onofrio also claims that even prior to the July 8 email, she made another request for on-site interpreters.  However, she could not remember the date when she made this request and did not provide any other detail.  (Doc. 117, p. 76) ("And there was another request I put in prior to that, but I don't remember the day.").  This is not sufficient evidence of a request.  Such a vague assertion, devoid of any context, explanation of Costco's response, or even a date, cannot support a finding that Costco failed to make reasonable accommodation in not providing on-site interpreters.

Finally, D'Onofrio acknowledges that she requested and was provided an on-site interpreter for her October 23, 2013 termination meeting with Costco.  (*Id.* p. 98).

### f.  D'Onofrio's Complaints Regarding Holliday

D'Onofrio also contends that the jury could have found that Costco failed to provide reasonable accommodations for her by allowing Holliday, who transferred into the Pompano Beach warehouse after the March 1, 2013 training program, to interact with and supervise her without first ensuring that he received the same deaf-culture training that was provided to her other supervisors in that program. (Appellant's Br. at 25, 31, 35). Relatedly, she contends the training itself was inadequate because Costco did not make the training materials widely available for other employees at the Pompano Beach warehouse. We find these arguments unpersuasive for several reasons.

First, as D'Onofrio repeatedly emphasized during her November 20, 2012 letter to Craig Jelinek, her December 12, 2012 meeting with LiCastro and Powers, and during her testimony at trial, she never had any difficulty communicating with any of her managers other than Pack. There is no evidence that she ever requested that Holliday be trained in deaf culture. To the contrary, D'Onofrio testified that she had no trouble communicating with Holliday, and also confirmed that Holliday knew sign language. (Doc. 118, p. 13). Holliday, too, confirmed the good relationship between the two; in his testimony, Holliday even described in detail their good relations when he first arrived at the Pompano Beach warehouse, which included his revealing to D'Onofrio that he had a deaf aunt with whom he was close while growing up. And, because of this experience, he knew a bit of sign language. (Doc.

122, p. 21).  Holliday also testified, without contradiction, that he was familiar with deaf culture based on the time he spent with his aunt and her deaf friends, and he had previously supervised deaf employees.  (*Id.* pp. 47-48).

Second, although Costco did not distribute the training materials to other employees at the Pompano Beach warehouse, this Court does not require accommodations provided by an employer to be perfect; our lodestar, instead, is reasonability.  The ADA does not impose liability on an employer for its failure to provide "all the accommodations [the employee] feels are appropriate." *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1451 (11th Cir. 1998); *see also* Stewart, 117 F.3d at 1285 (explaining that "the word 'reasonable' would be rendered superfluous in the ADA if employers were required in every instance to provide employees the maximum accommodation or every conceivable accommodation possible" (quotation omitted)).  D'Onofrio asked for a training program on deaf culture, an altogether reasonable request, and Costco provided a first-rate one.

Given the evidence assessed above, Costco sufficiently honored its reasonable-accommodations obligations to D'Onofrio in providing deaf-culture sensitivity training to Pack and the other managers in D'Onofrio's direct chain of command, without having to make Holliday undergo the same training.  In response to this evidence of Holiday's background, D'Onofrio advances no reason why he needed the training.  Furthermore, her argument is at odds with case law stating that

the ADA, and by extension the FCRA, cannot interfere with an employer's choice of supervisors over a given employee. *See Weiler v. Household Fin. Corp.*, 101 F.3d 519, 526 (7th Cir. 1996).

### g. D'Onofrio's Complaint Regarding Use of VRI at Meetings of Three or More Individuals

D'Onofrio also argues that VRI could not be considered a reasonable accommodation for any meeting in which three or more individuals were present, even if the only people speaking were her and her manager. (Appellant's Br. at 25). She bases this argument on information conveyed at the March 1, 2013 training by Williams, who suggested that for large-group meetings (i.e. staff meetings or inventory meetings) where people might be speaking, Costco should consider providing an on-site interpreter.

We find D'Onofrio's line of argument to be unavailing. (Doc. 140, pp. 18-20). To reiterate, D'Onofrio offers no evidence to establish that she ever submitted a request for on-site interpreters that Costco failed to honor. And, in fact, Costco regularly provided on-site interpreters in certain group settings. Undisputed evidence shows that on-site interpreters were in the room during D'Onofrio's initial meeting with Powers and LiCastro in December 2012 (Doc. 121, p. 108); when the Pompano Beach warehouse distributed the latest version of Costco's employee handbook (Doc. 117, pp. 68-69); and when Pack fired D'Onofrio. (*Id.*, p. 98). But

that is not all.  Holliday testified that "[w]henever we had a meeting, we would set up in advance an interpreter to come and interpret for" D'Onofrio.  (Doc. 122 at 59).  And, as Pack testified, he even "hired a live interpreter, a physical person on site to where [D'Onofrio] was in a meeting with other employees."  (Doc 118, p. 173).  In response, D'Onofrio offers no evidence that Costco held any other large-group meetings after the March 1, 2013 training program, for which an on-site interpreter was not present.

On this note, as well, Williams testified that although the statements she made during the deaf-culture training (about the on-site interpreter being preferable to the VRI even in situations of a three-person meeting) were genuine indications of her opinion, she did not believe that an on-site interpreter would be required in *every* such case.[7]  D'Onofrio has not offered evidence to undermine this proposition.  Therefore, we are left only with Williams's statement that an on-site interpreter is *not always* necessary—a point demonstrated by the record, based on Williams's accompanying statements regarding the general effectiveness of the technology in facilitating communication between deaf and non-deaf individuals.  Furthermore, we note the following: (1) evidence showing that there were typically, three, and occasionally, four people in the room at the disciplinary meetings in which Costco

---

[7] To reiterate, Williams also explained that an on-screen interpreter, like the VRI, can still work in a group setting, just not as easily or efficiently as an on-site interpreter would work.  (Doc. 121, p. 111).

relied upon VRI; and (2) uncontradicted testimony from Costco employees that the additional people in the meetings, beyond D'Onofrio and the manager, were witnesses or observers who generally said nothing during the meetings. (Doc 140, p 19).

Regardless of whether an on-site interpreter *might have been preferable* in the opinion of Williams, there is simply no basis in the evidentiary record to conclude that Costco's use of a supposedly less preferable medium—VRI—represented a failure to make reasonable accommodations. *Stewart*, 117 F.3d at 1285-86. This is especially true, given the absence of any evidence that D'Onofrio ever requested an on-site interpreter for these meetings, other than when she requested an interpreter for her October 23, 2013 termination meeting, which Costco provided.

### h.  The Three-Person Management Circle

At the March 1, 2013 training, Williams also suggested that it might be helpful for Costco to designate a small group of managers to be the primary people to interact with D'Onofrio in relaying directions to her and answering her questions. (Doc. 117, pp. 60-61; Doc. 121, p. 90).  Costco agreed with the proposal, and immediately implemented a three-person circle for D'Onofrio to primarily correspond with during her workdays.  However, Costco eventually decided to stop the arrangement after it appeared to D'Onofrio's supervisors that she was using the accommodations as an excuse to avoid all communication with individuals beyond

that immediate circle. Nonetheless, D'Onofrio insists that Costco's decision to terminate the arrangement supports that jury's finding that Costco failed to provide reasonable accommodations.

D'Onofrio's argument is unpersuasive. Although Costco implemented the three-person circle at the recommendation of Williams, D'Onofrio herself never requested it. (Doc. 117, pp. 40, 42-43, 149). An employer has no obligation to make any accommodation unless, and until, the employee specifically requests an accommodation. *See Gaston*, 167 F.3d at 1363 ("[T]he duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made[.]"). There is no evidence that D'Onofrio ever requested this accommodation; therefore, Costco cannot be legally at fault for terminating an arrangement it voluntarily implemented.

Moreover, when implementing this proposal, Costco made clear to D'Onofrio that the arrangement "did not mean she could circumvent her managers." (Williams testimony, Doc. 121, p. 115; Doc. 122 pp. 157-58). Notwithstanding this fact, under this Court's case law, any sort of accommodation that could be construed as essentially insulating D'Onofrio from any need to interact with Pack (or other managers) beyond the three designated primary points of contact, would have been unreasonable under the ADA. *See Gaul*, 134 F.3d at 581 (ADA does not limit employer's prerogative to determine with whom employees will work within

company); *see also Weiler*, 101 F. 3d at 526 (ADA does not require employer to transfer employee to a different supervisor or to transfer supervisor). Relatedly, even if the accommodation had theoretically been reasonable when implemented, an employer is allowed to discontinue accommodations that it had previously offered to an employee when those accommodations exceed what is required by the ADA. *See Holbrook*, 112 F.3d at 1528; *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1365 (S.D. Fla. 1999); *Sheets v. Fla. E. Coast Ry. Co.*, 132 F. Supp. 2d 1031, 1035 (S.D. Fla. 2001).

### i. Summary

Ultimately then, as we see it, D'Onofrio, understandably, needed help communicating with Pack. She relied on lip reading to communicate with her coworkers and supervisors, and Pack mumbled. So Costco installed two VRI phones. However, D'Onofrio says that was not enough; she wanted her supervisors to write back and forth with her. (JX 31; Doc. 117, p.68; Doc. 122 p. 35). Setting aside our oft-repeated reminder that a plaintiff is entitled to a reasonable accommodation, and not the specific accommodation of her choosing, *see Stewart*, 117 F.3d at 1286, the evidence shows that D'Onofrio's supervisors, including Pack, from time to time accommodated that request. (JX 25; JX 28; JX 29). But, even that was not enough for D'Onofrio, as she further states that Costco needed to provide in-person interpreters. But, we do not see any record evidence that suggests

Costco failed to provide an on-site interpreter once D'Onofrio requested this accommodation.  Again, to the contrary, we see evidence of the opposite: that Costco provided on-site interpreters for group meetings, in addition to the VRI technology for other communications.  Therefore, the only accommodation Costco did not provide that D'Onofrio had specifically requested was to move Pack to another location—and, given the circumstances of this case, Costco was not required to honor that request by the ADA.

## III.

We cannot hold that an employer fails to reasonably accommodate a deaf employee when it provides her with on-demand access to live sign-language interpreters at two, convenient locations within her place of work; when it goes further to provide on-site person interpreters for larger, group meetings; when it arranges a thorough training session on deaf culture, pursuant to the plaintiff's request; and when the plaintiff's general manager—the supervisor who was the sole subject of her sole complaint—resolves to improve his relationship with the plaintiff by attending multiple, one-on-one training sessions.  Therefore, because D'Onofrio cannot point to "a specific instance in which she needed an accommodation and was denied one," *Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018), we **AFFIRM** the district court's January 30, 2019 Order granting Costco's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).

WILSON, Circuit Judge, dissenting:

Following a nine-day trial, a jury found in favor of Christine D'Onofrio—an employee of Costco for over 20 years—on her claim that Costco failed to provide reasonable accommodation for her disability of deafness.  The jury awarded D'Onofrio $750,000 in damages for emotional pain and mental anguish and $25,000 in punitive damages.  The district court then granted Costco's renewed motion for judgment as a matter of law and conditionally granted its motion for a new trial, finding that no reasonable jury could have found that Costco failed to provide a reasonable accommodation to D'Onofrio.

On appeal, D'Onofrio argues that the evidence was sufficient to support the jury's verdict because it showed that (1) the video remote interpreter (VRI) devices, alone, were not a reasonable accommodation; (2) the deaf-culture training was ultimately ineffective because one of her managers, Alan Holliday, never received deaf-culture training; and (3) a three-member communication team was discontinued.  The majority sets forth trial testimony supporting Costco's defenses and affirms the district court.  But the jury, after a nine-day trial where it heard the testimony and observed the witnesses, found in favor of D'Onofrio on her failure-to-accommodate claim, awarding not just compensatory damages, but also punitive damages.  I would reverse the judgment as a matter of law, as the jury was well

within its prerogative to accept D'Onofrio's evidence over Costco's and make credibility determinations. I therefore dissent.

## I.

Judgment as a matter of law is only proper if there is "no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party." *Home Design Servs., Inc. v. Turner Heritage Homes, Inc.*, 825 F.3d 1314, 1320 (11th Cir. 2016) (alteration adopted). "[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 310 (11th Cir. 1988) (per curiam).

To prevail on her failure to accommodate claim, D'Onofrio had to show that (1) she was disabled, (2) she was a "qualified" individual, and (3) she was subjected to unlawful discrimination because of her disability. *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1200 (11th Cir. 2014). "[A]n employer's failure to reasonably accommodate an 'otherwise qualified' disabled employee itself constitutes unlawful discrimination, unless the employer can show 'undue hardship.'" *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1249 (11th Cir. 2007).

Here, a reasonable jury could have concluded that Costco failed to provide a reasonable accommodation for D'Onofrio's disability. First, D'Onofrio presented sufficient evidence that the installation of the VRI devices was not a reasonable

accommodation to her communication problems.  From the outset, D'Onofrio

expressed that her communication difficulties took place mostly on the sales

floor—where she performed her essential job functions—but the VRI devices were

in a managers' office and a pharmacy consultation room.  Further, while the

district court relied largely on the installation of the VRI devices in its order

granting judgment as a matter of law, Alan Pack, Steve Powers, and Dr. Shana

Williams testified that the VRI devices were not intended to be the only solution to

D'Onofrio's communication problems.  Finally, D'Onofrio presented evidence that

her communication problems were due to certain managers' apparent ignorance of

deaf culture—demonstrated by them failing to make eye contact, mumbling, and

negatively interpreting her use of body language—and a jury could reasonably

conclude that a VRI device did not address this issue in most circumstances.

A reasonable jury also could have concluded that the deaf-culture training

did not amount to a reasonable accommodation.  While the training session with a

handful of managers was positive, D'Onofrio presented evidence that Costco did

not pass on that training information to other Costco employees or managers who

worked with D'Onofrio, even though Dr. Williams gave Costco training materials

that could have been given to other employees.

More specifically, a reasonable jury could have concluded that the failure to

train D'Onofrio's subsequently hired manager, Holliday, in deaf culture resulted in

a failure to provide reasonable accommodation.  The majority dismisses this argument because D'Onofrio initially complained to Costco about problems with Pack and because Holliday had a deaf aunt that he spent time with while growing up.  But the district court found that while D'Onofrio primarily struggled with communicating with Pack, a reasonable jury could find that her request for accommodation was sufficient to communicate that her deafness caused more general communication problems and that her problems went beyond Pack. Further, the assertion that Holliday could have no need for training in deaf culture because he has one deaf relative sounds of tokenism, and a reasonable jury could have concluded that he did need such training.  Indeed, the jury heard evidence that Holliday disciplined D'Onofrio for displaying "aggressive behavior" through her body language, the volume of her voice, and demanding eye contact—behaviors that D'Onofrio asserted were common within deaf culture.

Last, though the three-person communication team was initially effective, and certainly not required, it was short term and there was no evidence that it resulted in a lasting change to D'Onofrio's communication problems with Costco managers.  Simply put, the implementation of this team for 10 weeks was not sufficient to undermine the jury's verdict that Costco failed to provide reasonable accommodation.

Accordingly, reasonable persons could have differed on the question of whether Costco failed to reasonably accommodate D'Onofrio's disability.  The jury acted within its role as the finder of facts "to weigh conflicting evidence and inferences, and determine the credibility of witnesses."  *Watts*, 842 F.2d at 310.  Therefore, I would reverse the district court's order granting judgment as a matter of law.

For similar reasons, I would reverse the district court's conditional grant of the motion for a new trial.  *See Hewitt v. B.F. Goodrich Co.,* 732 F.2d 1554, 1556 (11th Cir. 1984) (stating that a motion for a new trial is proper only where the jury's verdict is against the clear weight of the evidence or would result in a miscarriage of justice).